MAINE SUPREME JUDICIAL COURT                                    Reporter of Decisions
Decision:      2022 ME 8
Docket:        Cum-21-117
Argued:        October 6, 2021
Decided:       January 27, 2022

Panel:         STANFILL, C.J., and MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.


PATRICIA SARCHI, et al.

v.

UBER TECHNOLOGIES, INC., et al.


HORTON, J.

[¶1]  Uber Technologies, Inc., and Rasier, LLC, (collectively, Uber) appeal from an order denying their motion to compel arbitration entered by the Superior Court (Cumberland County, *McKeon, J.*).  Uber moved to compel arbitration pursuant to the Terms and Conditions (Terms) of its user agreement after Patricia Sarchi, a user of Uber's ride-sharing service, and the Maine Human Rights Commission (the Commission)[1] filed a complaint against Uber for violating the Maine Human Rights Act, 5 M.R.S. §§ 4592(8), 4633(2) (2021).  We agree with Sarchi's contention that the Terms were not binding

---

[1]  The Commission has the authority to bring a civil action when it "finds reasonable grounds to believe that unlawful discrimination has occurred."  5 M.R.S. § 4612(4)(A) (2021).  Before filing her complaint in the Superior Court, Sarchi filed a complaint with the Commission, and the Commission investigated and found reasonable grounds to believe that discrimination occurred.

upon her under the circumstances and affirm the court's denial of Uber's motion to compel arbitration.

## I. BACKGROUND

[¶2]  The following undisputed facts are drawn from the motion court's order.  Uber Technologies, Inc., is a business that offers a ride-sharing service through software applications (apps) for smartphones, including the Uber driver app and the Uber rider app, that enable registered riders to arrange and obtain rides from registered drivers.  Rasier, LLC, is a wholly owned subsidiary of Uber Technologies, Inc., that contracts with persons who use the Uber driver app to register as Uber drivers and provide rides to registered Uber riders.  Patricia Sarchi is blind and uses a guide dog.  With the help of her son, Sarchi registered for an Uber rider account in June 2015 through the Uber app on her phone.

[¶3]  The Uber rider app enables a user to register for an Uber rider account by interacting with a series of screens.  The third screen in the registration process displays the heading "LINK PAYMENT" at the top in black font with a light background.  The background of the screen beneath the heading is black.  Under the heading, a white bar appears and indicates that the user should enter a credit or debit card number.  Directly under the white bar,

bright blue text reads "scan your card" and "enter promo code."  At the bottom of the screen, light gray text reads "By creating an Uber account, you agree to the" and beneath that text is darker gray text, which is enclosed in a finely outlined gray box, that reads "Terms & Conditions and Privacy Policy."  The darker gray text in the box is hyperlinked to a screen containing additional hyperlinks to the referenced Terms and Privacy Policy.

[¶4]   Once the user clicks on the white bar to enter the credit card information, a keyboard pops up at the bottom of the screen, pushing the gray and darker gray text at the bottom upward toward the middle of the screen, as appears below in Figure 1.  When the user has entered payment information, a small "DONE" button at the top right of the screen becomes clickable.  Clicking "DONE" finalizes the creation of the user's account, although this is not specifically indicated anywhere on the screen.  Thus, a user can complete the registration process and create a rider account without clicking on the hyperlink to the Terms and without reading or affirmatively acknowledging the Terms.

4



*Figure 1*

[¶5]   At the time Sarchi registered, the Terms included the following

language:

> You agree that any dispute, claim or controversy arising out of or relating to these Terms or the breach, termination, enforcement, interpretation or validity thereof or the use of the Services (collectively, '*Disputes*') will be settled by binding arbitration between you and Uber . . . . You acknowledge and agree that you and Uber are each waiving the right to a trial by jury . . . .

[¶6]   In contrast to Uber's app for registering riders, its app for

registering drivers required express assent to the terms and conditions of

Uber's driver contracts. The driver registration process required, first, that the user click a button labeled "YES, I AGREE" below the statement "By clicking below you represent that you have reviewed all the documents above and that you agree to all the contracts above." Then, after the user clicked "YES, I AGREE," a pop-up box with the words "PLEASE CONFIRM THAT YOU HAVE REVIEWED ALL THE DOCUMENTS AND AGREE TO ALL THE NEW CONTRACTS" appeared, requiring the user to click another "YES, I AGREE" button.

[¶7] In November 2016, Uber sent Sarchi and other registered riders an email notifying them of updates to the arbitration provision and providing a hyperlink to the updated Terms. Rather than requiring the user expressly to signify assent to the updated Terms, Uber's email stated that continued use of Uber constituted the user's agreement to the updated Terms. The updated language read as follows:

> You and Uber agree that any dispute, claim or controversy arising out of or relating to (a) these Terms or the existence, breach, termination, enforcement, interpretation, or validity thereof, or (b) your access to or use of the Services at any time, whether before or after the date you agreed to the Terms, will be settled by binding arbitration between you and Uber, and not in a court of law.

[¶8] The email did not require users to open it or to read or acknowledge the updated Terms in order to remain registered or to use Uber's services, and Sarchi never became aware of the email or the updated Terms.

[¶9] On January 5, 2017, Sarchi, accompanied by her guide dog, attended a manicure appointment. After the appointment, she asked her manicurist to call her a taxi, and he suggested that she use Uber. Despite having downloaded the app in 2015, Sarchi had not used Uber. The manicurist used Sarchi's Uber app to request a ride for her. When the Uber driver arrived, he refused to drive Sarchi because of her guide dog.

[¶10] Sarchi and the Commission filed a complaint on April 23, 2020, alleging that Uber, through the act of its driver, had violated subsections 4592(8) and 4633(2) of the Maine Human Rights Act, 5 M.R.S. §§ 4592(8), 4633(2). Uber moved to compel Sarchi to arbitrate, and to dismiss or stay the action pending arbitration pursuant to the Federal Arbitration Act (FAA), 9 U.S.C.S. §§ 1-307 (LEXIS through Pub. L. 117-80, approved December 27, 2021, with a gap of Pub. L. 117-58), and, alternatively, the Maine Uniform Arbitration Act (MUAA), 14 M.R.S. §§ 5927-5949 (2021).

[¶11] The motion court held a nontestimonial hearing and denied the motion to compel on March 20, 2021.[2] The court concluded that Sarchi did not become bound by either the original Terms during the registration process in June 2015 or the updated Terms referenced in the November 2016 email. Noting the absence of Maine precedent on the enforceability of online contracts, the motion court rested its analysis on the traditional contract principle of mutual assent and echoed the reasoning of the Massachusetts Supreme Judicial Court in *Kauders v. Uber Technologies, Inc.*, which discussed a very similar Uber rider interface. 159 N.E.3d 1033, 1040 (Mass. 2021).

[¶12] Uber timely appealed.[3] 14 M.R.S. §§ 1851, 5945(1)(A) (2021); M.R. App. P. 2B(c)(1).

---

[2] Because the court denied the motion to compel, it did not rule on Uber's motion to stay the action. Even if Sarchi were required to arbitrate her complaint, the action would not necessarily be stayed, because the Commission has independent standing under the Maine Human Rights Act. *See* 5 M.R.S. §§ 4612(4), 4613(1) (2021). The Commission's authority to file an action derives not only from discrimination that the Commission determines has occurred against an individual complainant such as Sarchi but also from the potential for future discrimination against a protected class. *Id.* § 4612(4) (providing that the Commission's action is appropriate when it "believes that irreparable injury or great inconvenience will be caused . . . to members of a protected class group"). In this respect, the Commission is like the federal Equal Employment Opportunity Commission, which "has independent standing to sue in its own name, and its authority to seek victim-specific remedies for private individuals is not derivative of the rights of those individuals." *EEOC v. 5042 Holdings Ltd.*, 2010 U.S. Dist. LEXIS 8242, at *3 (N.D. W. Va. Jan. 11, 2010) (citing *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 295-97 (2002)).

[3] Although no final judgment has been entered in this case, interlocutory appeals from "order[s] denying an application to compel arbitration" are permitted by 14 M.R.S. § 5945(1)(A) (2021). This appeal thus falls within an exception to the final judgment rule and is reviewable by this Court. *See id.*; *Saga Commc'ns of New England, Inc. v. Voornas*, 2000 ME 156, ¶ 6 n.4, 756 A.2d 954.

## II. DISCUSSION

### A.    Standard of Review

[¶13]  "We review the denial of a motion to compel arbitration for errors of law and for facts not supported by substantial evidence in the record."[4] *Snow v. Bernstein, Shur, Sawyer & Nelson, P.A.*, 2017 ME 239, ¶ 7, 176 A.3d 729 (quotation marks omitted).

### B.    Applicable Substantive Law

[¶14]  This case involves issues of arbitration law and contract law.  Both the FAA and the MUAA promote arbitration.[5] *See, e.g.*, *Snow*, 2017 ME 239, ¶ 10, 176 A.3d 729 (stating that the "Maine legislature[ has a] strong policy favoring arbitration" (quotation marks omitted)); *AT&T Mobility LLC v. Concepcion*,

---

[4] In *Snow v. Bernstein, Shur, Sawyer & Nelson*, *P.A.*, in which we also considered the enforceability of an arbitration clause and, as here, "the facts before the Superior Court were set out in affidavits" rather than in a formal evidentiary record, we explained that "[b]ecause those affidavits did not contain any disputed facts, we determine de novo whether the court made any errors of law and whether the court's conclusion is supported by the facts."  2017 ME 239, ¶ 7, 176 A.3d 729.

[5] The FAA and the MUAA are both generally applicable to Maine arbitration agreements, *see Snow*, 2017 ME 239, ¶¶ 10, 25, 176 A.3d 729, but when addressing arbitration agreements, we generally focus on the MUAA rather than the FAA, *see, e.g.*, *V.I.P., Inc. v. First Tree Dev. Ltd. Liab. Co.*, 2001 ME 73, ¶¶ 3-4, 770 A.2d 95; *Roosa v. Tillotson*, 1997 ME 121, ¶¶ 3-4, 695 A.2d 1196; *Westbrook Sch. Comm. v. Westbrook Tchrs. Ass'n*, 404 A.2d 204, 206-07 (Me. 1979); 9 U.S.C.S. §§ 1-307 (LEXIS through Pub. L. 117-80, approved December 27, 2021, with a gap of Pub. L. 117-58); 14 M.R.S. §§ 5927-5949 (2021). In *Snow*, however, we addressed the question of federal preemption in the arbitration field. 2017 ME 239, ¶¶ 24-26, 176 A.3d 729.  We explained that "the FAA contains no express preemptive provision and does not reflect a congressional intent to occupy the entire field of arbitration [unless] state law . . . stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" or "sing[les] out arbitration contracts specifically" such that arbitration provisions are not on "the same footing as other contracts."  *Id.* ¶ 25 (quotation marks omitted).

563 U.S. 333, 339 (2011) (describing that the FAA "reflect[s] . . . a liberal federal policy favoring arbitration" (quotation marks omitted)). However, to be enforceable, an arbitration agreement must constitute a validly formed contract. *See Nisbet v. Faunce*, 432 A.2d 779, 782 (Me. 1981) (holding that under the MUAA "parties to a dispute cannot be compelled to submit the controversy to arbitration unless they have manifested in writing a contractual intent to be bound to do so").[6] Substantive arbitrability is governed by traditional rules of contract law. *See, e.g.*, *V.I.P., Inc. v. First Tree Dev. Ltd. Liab.*

---

[6] Although the parties have not raised the issue, we note that our decision in *Nisbet v. Faunce* can be read to imply that, to be bound by an arbitration provision, a party must have either signed an agreement containing it or agreed to it in a separate writing. 432 A.2d 779, 782 (Me. 1981) (interpreting the MUAA to require that an agreement to arbitrate must be reflected in either "a single signed document" or in "writings exchanged between the parties"). However, that conclusion went beyond the holding of the case on which we relied to support it. *See Me. Cent. R.R. Co. v. Bangor & Aroostook R.R. Co.*, 395 A.2d 1107, 1121 (Me. 1978). There, we decided that an exchange of writings was sufficient to manifest an intent to arbitrate but not that it was necessary. *Id.* We also stated that because the FAA is "substantially identical [and] has been interpreted not to require a signed agreement[,] . . . [w]e cannot believe that the [MUAA] is amenable to a contrary construction." *Id.*; *see* 14 M.R.S. § 5927 ("A written agreement to submit any existing controversy to arbitration . . . is valid . . . ."); 9 U.S.C.S. § 2 ("A written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy . . . shall be valid . . . .").

The federal courts have generally held that the FAA requires neither a signed writing nor that writings be exchanged by the parties. *See Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 89-90 (4th Cir. 2016) (collecting cases and holding that an arbitration agreement need not include a signature or written assent in order to meet the writing requirement in the FAA). For example, the Sixth Circuit held that, under the FAA, a written arbitration agreement was enforceable when employees were given a pamphlet which included an arbitration agreement and the pamphlet stated that continued employment constituted acceptance. *Seawright v. Am. Gen. Fin. Servs., Inc.*, 507 F.3d 967, 978 (6th Cir. 2007). Although our statement in *Nisbet* would bolster Sarchi's argument, 432 A.2d at 782, we need not rest our conclusion in her favor on *Nisbet* because Uber has not shown that Sarchi assented to Uber's arbitration provision by any sufficient means, whether through her signature, in a writing, or otherwise.

*Co.*, 2001 ME 73, ¶ 3, 770 A.2d 95 (holding that the MUAA renders arbitration invalid if "the parties did not agree to arbitrate," a determination to which "[g]eneral rules of contract interpretation apply"); *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) (explaining that "[w]hen deciding whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern formation of contracts").

[¶15] Under Maine contract law principles, "[a] contract exists when the parties mutually assent to be bound by all its material terms [and] the assent is either expressly or impliedly manifested in the contract." *McClare v. Rocha*, 2014 ME 4, ¶ 16, 86 A.3d 22 (quotation marks omitted). "It is essential to the formation of a valid and enforceable contract that there be a meeting of the minds of the parties to the contract, *i.e.* a mutual assent to be bound by its terms . . . ." *Ouellette v. Bolduc*, 440 A.2d 1042, 1045 (Me. 1982). We have held, however, that a party need not actually have read the terms of the contract in order to be bound by them. *See Francis v. Stinson*, 2000 ME 173, ¶ 42, 760 A.2d 209 (stating that "parties to a contract are deemed to have read the contract and are bound by its terms").

[¶16] We have not yet considered the enforceability of online contracts, but other courts have held that the formation of online contracts is governed

by the same principles as traditional contracts. *See, e.g.*, *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 61 (1st Cir. 2018) (noting that courts should not apply different legal principles just because a contract is formed online); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (explaining that "[w]hile new commerce on the Internet has exposed courts to many new situations, it has not fundamentally changed the principles of contract" (quotation marks omitted)).

[¶17]  Thus, we apply Maine contract law in deciding whether Uber is entitled to enforce the arbitration provision against Sarchi.  Because we have not addressed the formation and enforceability of online contracts, however, we look for guidance from jurisdictions that have explored those topics.

## C.    Online Contracts

### 1.    Categories of Online Contracts

[¶18]  At least four different types of online consumer contracts have evolved in the internet era: browsewrap, clickwrap, scrollwrap, and sign-in wrap.[7]

---

[7] The "wrap" suffix in online contract nomenclature derives from the "shrinkwrap" agreement, an earlier form of consumer adhesion contract.  *See Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 366 n.1 (E.D.N.Y. 2015).  A shrinkwrap agreement differs from the four online "wrap" agreement types in that "[a]ssent to a shrinkwrap agreement is not demonstrated at the time of purchase (like in the clickwrap context), and instead the customer's actions after receiving the product or service demonstrates his assent."  *Savetsky v. Pre-Paid Legal Servs., Inc.*, 2015 U.S. Dist. LEXIS 17591, at *8 (N.D. Cal. Feb. 12, 2015).  "A classic shrinkwrap agreement generally involves '(1) notice of a

> *Browsewrap* exists where the online host dictates that assent is given merely by using the site. *Clickwrap* refers to the assent process by which a user must click "I agree," but not necessarily view the contract to which she is assenting. *Scrollwrap* requires users to physically scroll through an internet agreement and click on a separate "I agree" button in order to assent to the terms and conditions of the host website. *Sign-in*[]*wrap* couples assent to the terms of a website with signing up for use of the site's services . . . .

*Berkson v. Gogo LLC*, 97 F. Supp. 3d 359, 394-95 (E.D.N.Y. 2015).

[¶19]  Of these four online contract types, only a scrollwrap agreement requires a user actually to view (albeit not necessarily read) the terms of the online contract before manifesting assent.  "[C]ourts have consistently found scrollwrap agreements enforceable because they present the consumer with a 'realistic opportunity' to review the terms of the contract *and* they require a physical manifestation of assent."  *Applebaum v. Lyft, Inc.*, 263 F. Supp. 3d 454, 465 (S.D.N.Y. 2017) (quoting *Berkson*, 97 F. Supp. 3d at 398-99).

[¶20]    Likewise, courts generally uphold clickwrap agreements.[8] *Berkson*, 97 F. Supp. 3d at 397-98 ("[A]lmost every lower court to consider the

---

license agreement on product packaging (i.e., the shrinkwrap), (2) presentation of the full license on documents inside the package, and (3) prohibited access to the product without an express indication of acceptance.'"  *Id.* (quoting *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428 (2d Cir. 2004)).

  [8]  Some of the judicial support for clickwrap agreements may actually have been directed to scrollwrap agreements, because "courts have not been consistent in distinguishing between scrollwrap and clickwrap agreements."  *Applebaum v. Lyft, Inc.,* 263 F. Supp. 3d 454, 465 (S.D.N.Y. 2017); *see also Berkson*, 97 F. Supp. 3d at 398 ("Some court decisions that use the term 'clickwrap' are in fact dealing with 'scrollwrap' agreements . . . .").  As an example, the court in *Applebaum* points to a Second Circuit opinion that characterizes clickwrap agreements as "typically requiring users to

issue has found 'clickwrap licenses' . . . enforceable." (quotation marks and alterations omitted)); *Kauders*, 159 N.E.3d at 1050 (noting that clickwrap agreements "are regularly enforced" and "are certainly the easiest method of ensuring the terms are agreed to" (quotation marks omitted)); *Meyer*, 868 F.3d at 75 ("Courts routinely uphold clickwrap agreements . . . ."); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1165 (N.D. Cal. 2016) ("[T]he closer digital agreements are to the clickwrap end of the spectrum, the more often they have been upheld as valid and enforceable."); *Hancock v. Am. Tel. & Tel. Co.*, 701 F.3d 1248, 1256 (10th Cir. 2012) ("Clickwrap agreements are increasingly common and have routinely been upheld." (quotation marks omitted)).

[¶21]  A browsewrap agreement, in contrast, is one in which "website terms and conditions of use are posted on the website typically as a hyperlink at the bottom of the screen."  *Kauders*, 159 N.E.3d at 1054 n.26 (quotation marks omitted).  Browsewrap agreements "are often unenforceable because there is no assurance that the user was ever put on notice of the existence of the terms or the link to those terms."  *Id.*; *see also Berkson*, 97 F. Supp. 3d at 396

---

click an 'I agree' box after being presented with a list of terms or conditions of use."  263 F. Supp. 3d at 465-66 (alteration omitted) (quoting *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 233 (2d Cir. 2016)).

14

(noting that courts generally do not enforce browsewrap agreements against individuals); *In re Facebook*, 185 F. Supp. 3d at 1164-65 (holding that browsewrap agreements are at the opposite end of the "enforceability spectrum" from clickwrap agreements).

[¶22]   "Sign-in wrap" agreements are a hybrid of clickwrap and browsewrap agreements.  *In re Juul Labs, Inc.*, 2021 U.S. Dist. LEXIS 157126, at *27 (N.D. Cal. Aug. 19, 2021).  Instead of requiring the user to click a box indicating agreement to the terms of service, as with a clickwrap agreement, sign-in wrap agreements notify the user of "the existence and applicability of the site's 'terms of use' when [the user] proceed[s] through the website's sign-in or login process," *Berkson*, 97 F. Supp. 3d at 399, effectively "bundl[ing] signing up for a service with agreement to the website's contractual terms," *Selden v. Airbnb, Inc.*, 4 F.4th 148, 156 (D.C. Cir. 2021).  Determining the enforceability of a sign-in wrap agreement "requires a fact-intensive inquiry." *Id.* (quotation marks omitted); *see also McKee v. Audible, Inc.*, 2017 U.S. Dist. LEXIS 174278, at *17-18 (C.D. Cal. July 17, 2017).

[¶23] In their analyses of the enforceability of online agreements, courts have focused on three primary variables in the technical features of the presentation of terms and conditions:[9]

- *Conspicuous terms or access to terms:* The more likely that the user must at least view, if not read, the terms themselves as a condition of utilizing the website or the product, the more likely that a court will hold that the terms are binding. *See, e.g.*, *Kauders*, 159 N.E.3d at 1049. If the user can use the website or the product without viewing the terms themselves, the conspicuousness of a hyperlink to the terms will strongly influence the determination of whether the terms are binding. *See Berkson*, 97 F. Supp. 3d at 401-02; *Kauders*, 159 N.E.3d at 1050. A hyperlink to terms should be clearly labeled as such—e.g., "Terms and Conditions"—and be readily recognizable as a hyperlink according to the conventions of the internet, by, for example, appearing in brightly-colored, underlined text. *See Cullinane*, 893 F.3d at 63; *Meyer*, 868 F.3d at 77-78.

- *Uncluttered screen:* Where notice or the hyperlink to agreement terms appears on an interface that is cluttered with other features and therefore is not easily spotted, an agreement is less likely to be binding on the user. *See Meyer*, 868 F.3d at 78; *In re Juul*, 2021 U.S. Dist. LEXIS 157126, at *36 (holding that the agreement was enforceable where the page was "relatively clear and uncluttered"); *Selden*, 4 F.4th at 156-57 (upholding the agreement where the notice was "unobscured by other visual elements").

---

[9] Beyond these variables having to do with the features of the website, the substantive content of the terms of an online contract bears upon their enforceability, as it does upon the enforceability of traditional contracts. *See, e.g.*, Restatement (Second) of Contracts §§ 178, 208 (Am. L. Inst. 1981). Although contractual arbitration provisions are commonly enforced, *see Snow*, 2017 ME 239, ¶ 10, 176 A.3d 729, our conclusion that the features of Uber's interface were insufficient to bind Sarchi to the Terms obviates any need to address the substantive enforceability of Uber's arbitration provisions, including whether public policy precludes the enforcement of an arbitration provision when the underlying claim involves alleged unlawful discrimination.

16

- *Explicit manner of expressing assent:* The more obvious the user's assent to terms, the more likely the terms will be binding. *See, e.g.*, *Kauders*, 159 N.E.3d at 1054-55. A clear and specific description of the effect of clicking on a button or a link is more likely to bind the user than a description that is vague. *See id.*; *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 582, 587 (N.D. Cal. 2020) (holding that the agreement was enforceable where the notice read "by tapping Sign Up, Continue with Facebook, or Continue with Google, you agree to our Terms"). Likewise, an agreement is more likely to be enforceable if the button to be clicked clearly signals assent, such as "I agree," rather than, for example, "continue" or "register." *See Kauders*, 159 N.E.3d at 1054-55; *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 236-37 (2d Cir. 2016) ("[C]licking 'Place your order' does not specifically manifest assent to the additional terms."). *But see Meyer*, 868 F.3d at 79-80.

[¶24] Based on criteria such as these, browsewrap agreements occupy one end of the spectrum of enforceability, clickwrap (and scrollwrap) agreements occupy the other, and sign-in wrap agreements fall somewhere in the middle, with their precise location on the spectrum almost entirely dependent on the features of the interfaces on which they appear. *See In re Facebook*, 185 F. Supp. 3d at 1165.

2. **Two-Step Inquiry**

[¶25] The increasing prevalence of online contracts means that "reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation of assent to those terms by consumers are essential if electronic bargaining is to have integrity and credibility." *Cullinane*, 893 F.3d at 61 (alteration, quotation marks, and emphasis omitted). The basic

question presented is "what level of notice and assent is required in order for a court to enforce an online adhesion contract?" *Id.* (quotation marks omitted); *see also Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764 (N.D. Cal. 2019) ("[T]he question is whether the plaintiffs were on inquiry notice of the arbitration provision by virtue of the hyperlink to the Terms of Service on the sign-up page and manifested their assent to the agreement by clicking 'sign up.'"). The essential requisites of reasonable notice and manifestation of assent have led many courts, in determining the enforceability of online adhesion contracts, to conduct a two-step inquiry. *See Cullinane*, 893 F.3d at 62; *Meyer*, 868 F.3d at 76; *Kauders*, 159 N.E.3d at 1049.

[¶26] The first step focuses on whether a user had reasonable notice of the online contract terms "consider[ing] the perspective of a reasonably prudent . . . user" of online technology. *Meyer*, 868 F.3d at 75, 77 (holding that whether a user is on notice "turns on the clarity and conspicuousness" of the terms (alteration and quotation marks omitted)); *see also Kauders*, 159 N.E.3d at 1050 (evaluating "the clarity and simplicity of the communication of the terms"); *Cullinane*, 893 F.3d at 62 (analyzing whether "terms were reasonably communicated" to the user). Whether an interface provides reasonable notice of the terms of an online contract does not necessarily turn on the classification

of the agreement as a scrollwrap, clickwrap, browsewrap, or sign-in wrap agreement; rather, it is essentially a function of how likely the terms and conditions themselves, or a hyperlink to them, are to come to the attention of the reasonably prudent user.

[¶27] The requirement of reasonable notice is necessarily satisfied if the user has actual notice of the terms, either by reviewing them or by otherwise interacting with them, such as by having to scroll through them. *See Kauders*, 159 N.E.3d at 1049 (concluding that actual notice will "generally be found where the user must somehow interact with the terms before agreeing to them"). "Absent actual notice, the totality of the circumstances must be evaluated in determining whether reasonable notice has been given . . . ." *Id.*

[¶28] If the user received reasonable notice of the terms of the online contract, the analysis moves to the second step—whether the user has manifested assent to the terms. *Meyer*, 868 F.3d at 76; *Cullinane*, 893 F.3d at 62; *Kauders*, 159 N.E.3d at 1050-51. Under Maine law, a party's assent to the terms of a contract can be express, as through words of agreement, or implied, as through conduct, but the words or conduct must objectively indicate an intent to be contractually bound. *See Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 9, 760 A.2d 1041. In the context of online contracts, the

question of assent often comes down to whether the website adequately informs the user that conduct such as clicking on a button constitutes assent to contract terms so as to justify an inference that the user intends to be bound. *See* Restatement (Second) of Contracts § 19 (Am. Law. Inst. 1981) ("[T]he conduct of a party is not effective as a manifestation of h[er] assent unless [s]he . . . knows or has reason to know that the other party may infer from h[er] conduct that [s]he assents.").  It follows that courts are more likely to enforce clickwrap contracts, which require explicit assent to contract terms, than browsewrap and sign-in wrap contracts, which do not.

[¶29]  We conclude that this two-step analysis, focusing on notice and assent, is appropriate for determining the enforceability of online contracts generally, and we turn to the question whether a contract was formed between Uber and Sarchi during the 2015 registration process, through the November 2016 email, or both.

**D.    Analysis**

**1.    The Registration Process**

[¶30]  Uber's registration process for riders is best characterized as a sign-in wrap agreement because, rather than requiring an affirmative manifestation of assent by the user, it informs the user that she is assenting to

the Terms by creating an Uber rider account. In contrast, Uber's registration process for drivers involves a clickwrap agreement in which the user must affirmatively signify agreement with the terms.

[¶31] The fact that Uber's registration interface has changed periodically complicates the analysis, because the enforceability of a sign-in wrap agreement is highly dependent on the particular layout and features of the interface at issue. *See, e.g.*, *Meyer*, 868 F.3d at 76. Ultimately, based on the appearance of the interface at the time Sarchi registered for Uber, we conclude that she was not bound by the Terms because Uber's registration procedure did not provide her with reasonable notice of their content and did not obtain a valid manifestation of her assent to be bound by them.

### a.    Reasonable Notice

[¶32] Although the decisions in *Kauders* and *Cullinane* are not binding, the similarities between the Uber interfaces that they analyzed and the interface at issue here mean that both decisions provide helpful guidance on whether Uber's interface gave Sarchi reasonable notice of the Terms.[10] *See Cullinane*, 893 F.3d at 56-57; *Kauders*, 159 N.E.3d at 1040.

---

[10] In *Cullinane v. Uber Technologies, Inc.*, the interface at issue was substantially similar to the one here, except that the text at the bottom of the screen reading "Terms of Service & Privacy Policy" was white, as opposed to gray, and was slightly larger. 893 F.3d 53, 56-57 (1st Cir. 2018). The description of the interface at issue in *Kauders v. Uber Technologies, Inc.*, matched that of the interface in *Cullinane*.

[¶33]   In *Cullinane*, the court concluded that the Uber interface did not provide reasonable notice of the terms to users who had not actually reviewed them.  *Cullinane*, 893 F.3d at 63-64.  The court noted that the hyperlink to the terms was not clearly identifiable as a hyperlink and that more eye-catching text on the screen detracted from the hyperlink's prominence:

> It is . . . the design and content of the "Link Card" and "Link Payment" screens of the Uber App interface that lead us to conclude that Uber's "Terms of Service & Privacy Policy" hyperlink was not conspicuous.  Even though the hyperlink did possess some of the characteristics that make a term conspicuous, the presence of other terms on the same screen with a similar or larger size, typeface, and with more noticeable attributes diminished the hyperlink's capability to grab the user's attention.  If everything on the screen is written with conspicuous features, then nothing is conspicuous.

*Id.*

[¶34]   In *Kauders*, the Massachusetts Supreme Judicial Court likewise determined that Uber's terms were not binding on the plaintiff, reasoning that (1) "the interface did not require the user to scroll through the conditions or even select them," (2) the notice provided in the rider app was much less conspicuous than the notice in the driver app because it did not require checking a box, "enabl[ing], if not encourag[ing], users to ignore the terms and

---

*Kauders v. Uber Techs., Inc.*, 159 N.E.3d 1033, 1040 (Mass. 2021).  Sarchi incorrectly asserts that the interface at issue in *Kauders* was "the very same" as the one here.  *See id.*

conditions," and (3) the placement of the terms and conditions at the end of the process on the "LINK PAYMENT" screen failed to draw the user's attention to the terms. 159 N.E.3d. at 1052-53.

[¶35] All of the observations about the Uber registration interface for riders in *Cullinane* and *Kauders* that led those courts to decide that Uber had not provided reasonable notice of its terms apply fully here. The appearance of the hyperlink to the Terms, specifically the lack of underlining and the muted gray coloring, means that it is not obviously identifiable as a hyperlink. The sequence in which it appears during the registration process renders it less likely to draw the user's attention. Its placement on the screen, particularly in light of the more prominent features on the same page, renders it relatively inconspicuous. Based on the totality of the features of the Uber interface that Sarchi utilized in registering—the focus on entering payment information rather than on the Terms; the small, lowercase font in which the notice and the Terms appeared; and the lightly outlined box containing the link to the Terms that did not have the appearance of a hyperlink or a clickable button—we conclude that the Uber interface Sarchi used to register failed to provide a prudent user with reasonable notice of the Terms.

[¶36]   Uber argues that *Kauders* and *Cullinane* represent the minority

rule.[11]  Uber relies heavily on *Meyer*, where the Second Circuit concluded that a

different version of Uber's registration interface for rider accounts provided

the plaintiff with reasonable notice of Uber's terms.  *Meyer*, 868 F.3d at 78-79,

81-82.  However, the differences between the registration interface at issue in

*Meyer* and the one at issue here are highly material.  The interface in *Meyer*

increased the likelihood that the terms would come to the user's attention—the

hyperlink text to the terms in *Meyer* was underlined and in blue, and the

hyperlink itself appeared in close proximity to the "REGISTER" button.[12]   *Id.*

at 71, 81.  In concluding that there was reasonable notice, the Second Circuit

---

[11]   Contrary to Uber's arguments, the overwhelming majority of case law does not support its position that Uber's interface gave Sarchi reasonable notice of the Terms.  As Uber contends, some decisions involving similar interfaces to the one involved here have enforced Uber's arbitration provisions.  *See Cordas v. Uber Techs., Inc.*, 228 F. Supp. 3d 985, 988, 990 (N.D. Cal. 2017); *Cubria v. Uber Techs., Inc.*, 242 F. Supp. 3d 541, 544, 548 (W.D. Tex. 2017); *West v. Uber Techs., Inc.*, 2018 U.S. Dist. LEXIS 233550, at *9-10, *14 (C.D. Cal. Sept. 5, 2018); *Grice v. Uber Techs., Inc.*, 2020 U.S. Dist. LEXIS 14803, at *3-4, *33 (C.D. Cal. Jan. 7, 2020).  However, some of the cases cited by Uber, like *Meyer v. Uber Technologies, Inc.*, involve a significantly different interface and are therefore less helpful given the fact-specific nature of this inquiry.  *See Meyer*, 868 F.3d 66, 81 (2d Cir. 2017); *Flores v. Uber Techs, Inc.*, 2018 U.S. Dist. LEXIS 219400, at *11-13 (C.D. Cal. Sept. 5, 2018) (stating that the registration process was the same as in *Meyer*, 868 F.3d 66); *Johnson v. Uber Techs., Inc.,* 2018 U.S. Dist. LEXIS 161155, at *10-12 (N.D. Ill. Sept. 20, 2018) (relying on *Meyer* and describing the interface displaying the words "Terms of Service & Privacy Policy" as "appear[ing] in a larger-sized font").

[12]   In addition to the color and underlining of the hyperlink, the screen at issue in *Meyer* looked considerably different from the one at issue here and in *Cullinane* or *Kauders* because, instead of clicking the "DONE" button in the upper right corner of the screen to complete registration, the user would click a large "REGISTER" button, which appeared in the middle of the screen in closer proximity to the hyperlinked terms.  *Compare Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 56-57 (1st Cir. 2018), *and Kauders*, 159 N.E.3d at 1040, *with Meyer*, 868 F.3d at 70-71.

24

relied on the uncluttered nature of the screen and the conspicuousness of the blue hyperlinked text. *Id.* at 76-81. Those material differences distinguish *Meyer* from this case. *Id.* at 70-71, 81.[13]

### b. Manifestation of Assent

[¶37] Even if the Uber registration process for rider accounts had provided reasonable notice of the Terms, we agree with Sarchi that the process was insufficient to place her on notice that registration as a rider would constitute assent to the Terms.

[¶38] We reject Uber's contention that Sarchi became bound to the Terms by clicking on the "DONE" button after entering payment information. First, to a reasonably prudent user, clicking "DONE" would not indicate assent

---

[13] Our conclusion and the context-specific methodology underlying it comport with cases dealing with other sign-in wrap agreements. *See McKee* v. *Audible, Inc.*, 2017 U.S. Dist. LEXIS 217391, at *22-24 (C.D. Cal. Oct. 26, 2017) (holding that there was not reasonable notice in part because "the disclosure appears in small, undifferentiated font" and because it did "not appear directly below the button [and was] separated by several lines of text, an Audible insignia, and a border"); *Berkson*, 97 F. Supp. 3d at 404 ("The hyperlink to the 'terms of use' was not in large font, all caps, or in bold. . . . By contrast, the 'SIGN IN' button is very user-friendly and obvious, appearing in all caps . . . ."). Although courts have occasionally held that sign-in wrap agreements do give reasonable notice to users, the features of the websites at issue in some of those cases are distinguishable from the features of the interface in this case. *See, e.g.*, *Selden v. Airbnb, Inc.*, 4 F.4th 148, 152, 155-56 (D.C. Cir. 2021) (concluding that there was reasonable notice because the hyperlinked terms appeared in red text on a white background on the uncluttered sign-up screen); *Snow v. Eventbrite, Inc.*, 2020 U.S. Dist. LEXIS 193249, at *19-20 (N.D. Cal. Oct. 19, 2020) (explaining that the user had reasonable notice of a sign-in wrap agreement when the "I accept the terms of service" statement was directly above the "pay now" button and the hyperlink appeared in blue); *Peter v. Doordash, Inc.*, 445 F. Supp. 3d 580, 582-83, 587 (N.D. Cal. 2020) (concluding that there was reasonable notice where the hyperlink to the terms was blue and underlined).

to a contract or, in fact, anything beyond having completed the registration process. Given that the heading of the window read "LINK PAYMENT," a reasonable user could easily think that clicking "DONE" meant that she was merely done entering her payment information, not done creating an account, much less agreeing to specific terms and conditions of the account. As Uber points out, the hyperlink notice leading to the Terms was on the same page as the "DONE" button. But the notice did not refer to the "DONE" button or explain the significance of clicking the "DONE" button, as it could have by indicating, for example, "By clicking DONE, you agree to the Terms."

[¶39] In addition to the ambiguity of the "DONE" button, the distance on the screen between the notice and the button was problematic. The "DONE" button appeared on the upper right corner of the screen, as far as possible from the notice and hyperlink, which appeared at the bottom of the screen. As the court in *Meyer* noted, the proximity of the notice to the button is important in determining whether the act of clicking the button can serve as a manifestation of the user's assent. 868 F.3d at 80.

[¶40] The courts that have addressed Uber's registration process have been inconsistent on whether the user actually manifests assent to the terms when registering for an account. Decisions concluding that the user does

manifest assent have sometimes evaluated a different interface than the one at issue here. *See id.* at 81; *Flores v. Uber Techs., Inc.*, 2018 U.S. Dist. LEXIS 219400, at *12-13 (C.D. Cal. Sept. 5, 2018); *Johnson v. Uber Techs., Inc.*, 2018 U.S. Dist. 161155, at *10-12 (N.D. Ill. Sept. 20, 2018). In *Meyer*, for instance, the Second Circuit held that the user had manifested assent, but it rested its conclusion on the proximity of the hyperlinked terms to the "REGISTER" button in the iteration of the interface at issue in that case. 868 F.3d at 79-80. In *Kauders*, although the court did not reach the issue of assent because it found that there was not reasonable notice, the court noted that "the interface . . . obscured the manifestation of assent" because clicking "DONE" on the payment screen is "different from, and less clear than, other affirmative language such as 'I agree.'" 159 N.E.3d at 1054.[14]

[¶41] Our conclusion that Sarchi did not manifest assent does not necessarily conflict with courts' analyses of other sign-in wrap agreements. Although many courts have held that sign-in wrap agreements do obtain users' valid assent, the cases before those courts often presented distinguishable facts. *See, e.g.*, *In re Juul*, 2021 U.S. Dist. LEXIS 157126, at *17 ("[T]he [users] were

---

[14] The court in *Cullinane* did not reach this question because it held that Uber had not succeeded in establishing reasonable notice. *See Cullinane*, 893 F.3d at 64.

required to affirmatively check a box . . . ."); *Selden*, 4 F.4th at 156-57 (holding that the user manifested assent where the language of the button—"Sign up"—matched the notice—"By signing up, I agree . . ."); *In re Facebook*, 185 F. Supp. 3d at 1166 (holding that the agreement was enforceable where the notice language matched the button).

[¶42]  We also agree with the *Kauders* court that, although not dispositive, Uber's use of a clickwrap agreement in its driver app undermines its defense of its use of a sign-in wrap agreement for riders.  "Clearly, Uber knows how to obtain clear assent to its terms."  *Kauders*, 159 N.E. 3d at 1055.

## 2.    The November 2016 Email

[¶43]  Finally, Uber contends that, whether or not Sarchi's registration of her rider account bound her to the Terms, Sarchi's use of Uber after Uber sent her the November 2016 email with the updated Terms "constituted a second and independent . . . acceptance."  Like the original Terms, the updated Terms included an arbitration provision that Uber claims is binding on Sarchi.  We thus must separately determine whether Uber's November 2016 email created an enforceable contract that bound Sarchi to the updated Terms.  Neither party argues that the updated Terms made any material change to the original Terms.

28

[¶44]  We need not apply the online contract analysis discussed above because the record does not indicate that Sarchi ever became aware of or interacted with Uber's November 2016 email.  She stated that she was unaware of the email and that she would have had no reason to pay attention to an email from Uber because she was unaware of the original Terms or that Uber deemed her to have assented to them.  Although the November 2016 email provided that use of the Uber app constituted acceptance of Uber's updated terms, it did not notify users who opened the app that they were bound by the updated Terms.  Moreover, that Sarchi never opened the email message but was able to retain her status as a registered Uber rider and book an Uber ride justifies the inference that the email lacked even the limited indicia of notice and assent associated with a browsewrap contract.

[¶45]  Because Sarchi had no reason to know that her use of Uber constituted acceptance of the updated Terms, no contract was formed based on those terms.  *See* Restatement (Second) of Contracts § 19 (Am. Law. Inst. 1981).[15]

---

[15]  We are unpersuaded by Uber's citations to out-of-state trial court decisions, most of which are inapposite because the courts had already established that the users were bound by the original terms.  *See Sacchi v. Verizon Online LLC*, 2015 U.S. Dist. LEXIS 21349, at *11-12 (S.D.N.Y. Feb. 23, 2015); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1166-67 (N.D. Cal. 2016); *Pincaro v. Glassdoor, Inc.*, 2017 U.S. Dist. LEXIS 147517, at *15-16 (S.D.N.Y. Sept. 12, 2017); *West*, 2018 U.S. Dist. LEXIS 233550, at *11, *13.

## E.    Conclusion

[¶46]  Uber could have designed its rider app to incorporate scrollwrap or clickwrap contracts that provided adequate notice of Uber's original and updated Terms and required consumers to express actual assent, and it apparently decided not to do so.  The consequence of that choice is that Sarchi was not bound by either the original Terms or the updated Terms.

The entry is:

> Order denying motion to compel arbitration
> affirmed.

---

Jesse E. Weisshaar, Esq., Shook, Hardy & Bacon L.L.P., Washington, District of Columbia; Daniel B. Rogers, Esq. (orally), Shook, Hardy & Bacon L.L.P., Miami, Florida; and Riley C. Mendoza, Esq., Shook, Hardy & Bacon L.L.P., Chicago, Illinois, for appellants Uber Technologies, Inc., and Rasier, LLC

Kristin L. Aiello, Esq. (orally), Disability Rights Maine, Augusta, for appellee Patricia Sarchi

Barbara Archer Hirsch, Esq., Maine Human Rights Commission, Augusta, for appellee Maine Human Rights Commission

Cumberland County Superior Court docket number CV-2020-175
For Clerk Reference Only