**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 20-1187**

BARRY ROWLAND; DONNA ROWLAND,

   Plaintiffs – Appellees,

v.

SANDY MORRIS FINANCIAL & ESTATE PLANNING SERVICES, LLC;
SANDEVA O'BRYAN MORRIS,

   Defendants – Appellants,

and

GLOBAL FINANCIAL PRIVATE CAPITAL, LLC; GF INVESTMENT
SERVICES, LLC; MINNESOTA LIFE INSURANCE COMPANY,

   Defendants.

Appeal from the United States District Court for the Western District of North Carolina, at Statesville.  Kenneth D. Bell, District Judge.  (5:19-cv-00069-KDB-DCK)

Submitted:  March 12, 2021          Decided:  April 7, 2021

Before WILKINSON, NIEMEYER, and QUATTLEBAUM, Circuit Judges.

Affirmed by published opinion.  Judge Wilkinson wrote the opinion, in which Judge Niemeyer and Judge Quattlebaum joined.

Donald R. Pocock, NELSON MULLINS RILEY & SCARBOROUGH LLP, Winston-Salem, North Carolina, for Appellant. Brooke A. Howard, HOWARD LAW, PLLC, Raleigh, North Carolina; James A. Roberts, III, Matthew D. Quinn, LEWIS & ROBERTS, PLLC, Raleigh, North Carolina, for Appellees.

WILKINSON, Circuit Judge:

In this appeal, defendants Sandeva "Sandy" Morris and Sandy Morris Financial LLC (SMF) challenge the district court's denial of their motion to compel arbitration of plaintiffs Barry and Donna Rowland's North Carolina contract and tort claims. Because we agree with the district court that the parties did not form an agreement to arbitrate, we affirm the order below.

I.

In 2014, the Rowlands first met with Morris in Tampa, Florida, for financial planning advice. Later that year, they moved to North Carolina but continued to use Morris and her firm for their financial affairs. From 2015 to 2018, Morris served as the Rowlands' financial advisor. In 2015, Morris sold them two annuity contracts and the next year recommended a particular universal life insurance policy, which the Rowlands purchased.

The Rowlands expanded the scope of their professional relationship with Morris and her firm in 2017 by hiring her to manage their investment accounts. To do this, plaintiffs filled out SMF's Asset Management Agreement (AMA) and new account forms from TD Ameritrade. The AMA and TD Ameritrade forms were bundled together in a single pdf. The brokerage forms rolled money from Mr. Rowland's Charles Schwab IRA over to a TD Ameritrade IRA managed by Morris and her firm. The AMA included an addendum and a Risk Profile Questionnaire (RPQ) that documented what accounts SMF was to manage and how the firm was to manage them.

The AMA also included an arbitration section. It required the parties to use arbitration to settle "any controversy or dispute which may arise between Client and Sandy

3

Morris Financial concerning any transaction or the construction, performance or breach of this Agreement." J.A. 121. The AMA dictated that the rules of the American Arbitration Association would govern any arbitration. J.A. 121. Right above the signature block, the contract included this disclaimer, bolded and in all capital letters: "This Agreement contains a pre-dispute arbitration clause." J.A. 122.

On October 2, 2017, Mr. Rowland received a fifty-four-page pdf from SMF, which included the AMA and the TD Ameritrade documents. He signed and returned the document via Docusign, a well-recognized online platform for signing and transmitting documents. When SMF received the signed agreement, Steve Zanolli, the Chief Compliance Officer, signed it on behalf of SMF.

Unfortunately the Rowlands' investments did not work out as they had hoped. After the Rowlands commenced this suit in the Western District of North Carolina for state law contract and fraud claims, the parties submitted different versions of the AMA to the district court for its decision on Morris and SMF's motion to compel arbitration. The Rowlands' version (Rowland AMA) included on page fourteen of the AMA one account (ending in 8519) for management by SMF and Mr. Rowland's Docusign signature. And on page fifteen, the RPQ did not have a box marked for Risk Tolerance or Investment Objective, nor did it denote how many years of experience Mr. Rowland had with stocks— the only investment vehicle for which he indicated having any background. This page also had Mr. Rowland's Docusign signature.

The version submitted by SMF (SMF AMA) with Zanolli's signature was not the same. The SMF AMA included a second account (ending in 8521) and Sandy Morris's

4

signature. And the RPQ on page fifteen of the AMA had several boxes left blank by Mr. Rowland checked in a different color ink. It had his risk tolerance marked as "Moderate," his investment objectives marked as both "Balanced" and "Growth & Income," and his investment experience expanded to "Mutual Funds" with thirty years of experience denoted for both mutual funds and stocks. J.A. 125. Finally, the document had marked that the Rowlands would need "$6" of their assets in less than three years. J.A. 125.

Defendants filed motions to compel arbitration, to dismiss for lack of personal jurisdiction, to transfer venue, and to dismiss for failure to state a claim. The district court denied all of them. On the arbitration motion, the court found that the parties had not formed an agreement to arbitrate. On February 18, 2020, Morris and SMF timely filed a notice of appeal. Though noting that the defendants' "appeal could be considered frivolous," the district court nonetheless granted them a stay during the pendency of this appeal. J.A. 396. We have jurisdiction pursuant to 9 U.S.C. § 16(a)(1).

## II.

We review "the decision to deny [a] motion for stay and to compel arbitration" *de novo. Noohi v. Toll Bros., Inc.*, 708 F.3d 599, 602 (4th Cir. 2013) (quoting *Patten Grading & Paving, Inc. v. Skanska USA Bldg., Inc.*, 380 F.3d 200, 204 (4th Cir. 2004)). Whether an agreement to arbitrate was formed is a question of "ordinary state-law principles that govern the formation of contracts." *Hill v. Peoplesoft USA, Inc.*, 412 F.3d 540, 543 (4th Cir. 2005) (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)). We review these questions of state contract law *de novo* as well. *Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 178 (4th Cir. 2013).

5

Furthermore, in reviewing the district court's denial of a motion to compel arbitration, "we accept as true the allegations of the . . . Complaint that relate to the 'underlying dispute between the parties.'" *Berkeley Cty. Sch. Dist. v. Hub Int'l Ltd.*, 944 F.3d 225, 233 (4th Cir. 2019) (quoting *Schnabel v. Trilegiant Corp.*, 697 F.3d 110, 113 (2d Cir. 2012)).

A.

In the modern American legal system, arbitration is an important means of dispute resolution. When state and federal courts require time-consuming, complex, and expensive procedures, arbitration offers a means of dispute resolution that is faster, easier, and cheaper for parties to utilize. And it has been given the imprimatur of the Supreme Court over the last decade. *See, e.g.*, *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019); *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011).

It was not always so. When Congress passed the Federal Arbitration Act (FAA), Pub. L. No. 68-401, 43 Stat. 883 (1925), it did so in response to extreme judicial hostility to arbitration. The FAA "sought to 'overcome the rule of equity, that equity will not specifically enforce any arbitration agreement'" because first the English—and then the American—courts jealously guarded their own jurisdiction. *Southland Corp. v. Keating*, 465 U.S. 1, 13 (1984) (quoting *Hearing on S. 4214 Before a Subcomm. of the S. Comm. on the Judiciary*, 67th Cong. 6 (1923) (remarks of Sen. Walsh)).

Since the FAA established "a national policy favoring arbitration," *id.* at 10, the Supreme Court has been quick to halt the lower courts' creation of exceptions to the FAA

6

that have no basis in the statute's text. In *Italian Colors*, the Court rejected the "judge-made exception to the FAA" that declared arbitration "agreements that prevent the 'effective vindication' of a federal statutory right" to be unenforceable. 570 U.S. at 235. More recently, the Supreme Court unanimously rejected the "wholly groundless" exception adopted by four circuits. *Henry Schein*, 139 S. Ct. at 528. Under this exception, district judges had denied motions to compel arbitration when they found the movant's "argument that the arbitration agreement applie[d] to the particular dispute [to be] 'wholly groundless.'" *Id.* at 527–28.

This is not to say that district courts are to grant blindly all motions to compel arbitration. The FAA balances the goals of facilitating arbitration with the aims of contract law by recognizing a limited role for federal courts to play. The statute mandates that "[i]f the making of the arbitration agreement . . . be in issue, the court shall proceed summarily to the trial thereof." 9 U.S.C. § 4. The Supreme Court has also held that when the parties disagree as to whether an agreement to arbitrate has been formed, "the dispute is generally for courts to decide." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010).

There is a difference between disputes over arbitrability and disputes over contract formation. *See Hub Int'l*, 944 F.3d at 234 n.9. While "'parties may agree to have an arbitrator decide . . . gateway questions of arbitrability,'" such an agreement does not "preclude a court from deciding that a party never made an agreement to arbitrate *any* issue." *Id.* (quoting *Henry Schein*, 139 S. Ct. at 529). That is, it does not erase the court's obligation to determine whether a contract was formed under 9 U.S.C. § 4. Thus the

7

incorporation of the rules of the American Arbitration Association, which allow the arbitrator to rule on questions of arbitrability, *see* Am. Arbitration Ass'n, *Consumer Arbitration Rules*, R-14 (amended Sept. 1, 2014), does not obviate the need for courts to decide the threshold issue of contract formation.

This pre-arbitration process accomplishes an important function. It must be remembered that mandatory arbitration is not the default form of dispute resolution but rather is permitted only when the parties agree to it. "Arbitration is," after all, "a matter of contract." *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 67 (2010). A party cannot be forced into arbitration. Rather, parties must actually contract to arbitrate disputes between them. Section 4 of the FAA has made clear that it is up to courts to determine whether a contract has been formed, and the district court properly heeded that call. This respects party autonomy and the general principles of contract law.

B.

Having found that the district court was the proper one to resolve the parties' dispute over whether they agreed to arbitrate, we now turn to how that disagreement ought to be resolved.

Section 4 of the FAA requires the court to conduct a trial of the issue if there are "'sufficient facts' support[ing] a party's denial of an agreement to arbitrate." *Hub Int'l*, 944 F.3d at 234. However, the right to a jury trial "is not automatic." *Chorley Enters., Inc. v. Dickey's Barbecue Rests., Inc.*, 807 F.3d 553, 564 (4th Cir. 2015). Just as in traditional litigation, the district court must employ the summary judgment standard as a gatekeeper, so a trial occurs only if there are "genuine issues of material fact." *Id.*; *see also*

*Hub Int'l*, 944 F.3d at 234. In applying that standard, the burden is on the defendant to "establish[] the existence of a binding contract to arbitrate the dispute." *Minnieland Private Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017). Here the district court in effect granted summary judgment to the plaintiffs by finding that, as a matter of law, the parties did not form an agreement. We have long held that appropriate. *See, e.g.*, *Stedor Enters., Ltd. v. Armtex, Inc.*, 947 F.2d 727, 732–33 (4th Cir. 1991).

Whether an agreement to arbitrate was formed is, as we have noted, a question of ordinary state contract law principles. *See Chorley Enters.*, 807 F.3d at 563. Here, as both parties agree, the dispute is governed by North Carolina law. For a valid contract to be formed, the two parties must "assent to the same thing in the same sense, and their minds meet as to all terms." *Normile v. Miller*, 326 S.E.2d 11, 15 (N.C. 1985) (quoting *Goeckel v. Stokely*, 73 S.E.2d 618, 620 (N.C. 1952)). There must be "an offer and acceptance in the exact terms." *Id.* If the original terms are changed or new ones added, "there is no meeting of the minds." *Id.* (quoting 8A G. Thompson, Commentaries on the Modern Law of Real Property § 4452 (1963)). "When there has been no meeting of the minds on the essentials of an agreement, no contract results." *Creech v. Melnik*, 495 S.E.2d 907, 912 (N.C. 1998). This is nothing more than the standard black-letter law taught in every first year Contracts course.

Based on the undisputed evidence submitted by both parties, there was no such meeting of the minds—and thus no contract—because both parties did not agree to the same terms. The parties make a fuss about Docusign, the other files in the pdf with the

9

AMA, whether there was a counteroffer, and how the differences in the AMAs submitted by each party came about. But at its core, this is a very simple contract dispute.

To wit, Mr. Rowland signed the AMA, which he submitted into evidence. Morris and SMF did not dispute that the Rowland AMA was in fact the version that Mr. Rowland signed. Morris and SMF also submitted into evidence the AMA that their agent signed. Mr. Rowland never received a copy of the SMF AMA and did not dispute that the version SMF submitted was the version that they signed. Those two AMAs differed as to a number of terms. In particular, an unknown employee at SMF added an extra account to be managed and filled in Mr. Rowland's investment objectives and risk preferences, which according to the contract, were to govern how SMF managed his money. There was no evidence in the record that Mr. Rowland ordered them to do so or was even informed that they made such changes. There was no evidence that he reviewed or initialed those changes.

These discrepancies are not minor—they are material differences in the agreement between the parties. An investment advisor cannot unilaterally add another account for it to manage. The investment objectives and risk tolerance of the client are not insignificant preferences; rather, they set the ground rules for how SMF was to manage the plaintiffs' money. The designation of which accounts were to be managed and how they were to be managed would be of paramount importance for any couple turning over its hard-earned savings to a financial firm for management. SMF did not bother to solicit from Mr. Rowland this information after he submitted the signed form, when it easily could have done so. Either one of the above omissions was sufficient to make for a material difference

10

defeating the formation of the contract. Together they undoubtedly did so. Because the difference in material terms in the AMA prevented a meeting of the minds on the essential elements of the contract, we find that no contract between the parties was formed.

Although not dispositive, it is important to note the difference in sophistication of the parties. The Rowlands are individuals without extensive personal experience in finance or investing. Morris is a certified financial professional and her firm is in the business of managing money. The documents were so technical and voluminous as to daunt, and perhaps overwhelm, persons with the plaintiffs' level of experience. We are not saying that volume or difference in sophistication is sufficient to defeat the formation of a contract, but the firm changing terms of an agreement after the customer signs it certainly does not add to the impression of fairness that one hopes to get from a financial institution managing an individual investor's portfolio.

C.

There is no question that the digital age has changed the nature of contract formation. *See, e.g.*, Robin Bradley Kar & Margaret Jane Radin, *Pseudo-Contract and Shared Meaning Analysis*, 132 Harv. L. Rev. 1135, 1141–42 (2019) (discussing how the Internet allowed a rise in boilerplate language that changed contracting and stretched traditional legal concepts); Ian Ayres & Alan Schwartz, *The No-Reading Problem in Consumer Contract Law*, 66 Stan. L. Rev. 545 (2014) (discussing the difficulty of translating the duty to read to the Internet era). Long gone are the days when two parties might sit down across a wooden table and sign with their own pens the same sheet of paper. With the advent of email, what is the significance of the Mailbox Rule? *See generally*

11

Restatement (Second) of Contracts § 63 (Am. Law Inst. 1981). One can now send drafts, modifications, edits, and revisions with such speed and alacrity that it becomes easy to get sloppy. A casual Internet browser might enter a contract with a company merely by using its website. *See, e.g.*, *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1175–76 (9th Cir. 2014) (discussing "clickwrap" and "browsewrap" agreements online). In some cases, an "electronic 'click' can suffice to signify the acceptance of a contract." *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1033 (7th Cir. 2016). For the unwary, this can be treacherous.

Although "new commerce on the Internet has exposed courts to many new situations"—and opened up useful new tools through which contracting parties can communicate—"it has not fundamentally changed the principles of contract." *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 403 (2d Cir. 2004). Courts are not licensed to ignore the old chestnuts—cases that remind us that (1) certain formalities are required for a contract to be formed, *see Bailey v. West*, 249 A.2d 414 (R.I. 1969), and (2) when the formalities are met, a contract it does make, *see Lucy v. Zehmer*, 84 S.E.2d 516 (Va. 1954) (finding an impromptu land contract on a napkin agreed to over drinks to be an enforceable contract).

"About suffering, they were never wrong, / The old Masters." W.H. Auden, *Musee des Beaux Arts* (1938). Perhaps the same can be said about formalities. Justice Holmes once declared "that all contracts are formal, that the making of a contract depends not on the agreement of two minds in one intention, but on the agreement of two sets of external signs—not on the parties' having *meant* the same thing but on their having *said* the same

12

thing." Oliver Wendell Holmes, *The Path of the Law*, 110 Harv. L. Rev. 991, 996 (1997) (reprint of address given at Boston University School of Law on January 8, 1897). The electronic age has not made the formalities of contract less crucial, but more so—it is imperative that parties turn square corners and ensure that the documents on which signatures are affixed are as identical as possible and certainly identical as to all material terms. In the past, parties meeting face-to-face might have interacted with other people who could testify as to disputed facts over contract formation. When personal contact (and perhaps extrinsic evidence) is reduced, and documents are swapped back and forth via email or Docusign, there may be fewer such people. All we are left to rest on are the formalities.

### III.

What happened here was at best sloppy on the part of Morris and SMF and at worst duplicitous—changes effected by sleight of hand. We need not decide which because, either way, no contract was formed. Unilateral unratified material changes on the part of Morris and her firm prevented the formation of a contract. Thus we readily affirm the order of the district court declining to compel arbitration.

*AFFIRMED*