**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-2010**

_____

LORETTA SABRINA MARSHALL, Individually and on behalf of all others similarly situated,

               Plaintiff - Appellee,

     v.

GEORGETOWN MEMORIAL HOSPITAL, d/b/a Tidelands Health,

               Defendant - Appellant.

_____

Appeal from the United States District Court for the District of South Carolina, at Charleston.  Richard Mark Gergel, District Judge.  (2:21-cv-02733-RMG-JDA)

_____

Argued:  January 23, 2024                           Decided:  August 13, 2024

_____

Before KING, GREGORY, and HARRIS, Circuit Judges.

_____

Affirmed by published opinion.  Judge Harris wrote the majority opinion, in which Judge King and Judge Gregory joined.

_____

**ARGUED:**  Thomas Alan Bright, OGLETREE DEAKINS NASH SMOAK & STEWART, PC, Greenville, South Carolina, for Appellant.  Shelby Hannah Leighton, PUBLIC JUSTICE, PC, Washington, D.C., for Appellee.  **ON BRIEF:**  David A. Nauheim, NAUHEIM LAW OFFICE, LLC, Charleston, South Carolina, for Appellee.

_____

PAMELA HARRIS, Circuit Judge:

Loretta Marshall applied for a nursing job with Tidelands Health, using Tidelands' online application process. After Marshall failed a mandatory physical agility test, she was denied employment. Marshall then sued Tidelands in federal court, alleging that its use of the physical agility test constitutes prohibited discrimination.

Tidelands moved to compel arbitration, arguing that the online application materials submitted by Marshall included an arbitration agreement covering the parties' dispute. The district court denied the motion, concluding that Tidelands had not shown the existence of an agreement to arbitrate. We agree with the district court and affirm its judgment.

## I.

### A.

This appeal arises from a putative class action against Tidelands Health ("Tidelands"), a South Carolina healthcare provider. The action challenges Tidelands' policy of requiring new hires to pass a physical agility test, alleging principally that this policy discriminates against persons with disabilities in violation of the Americans with Disabilities Act, or the ADA, 42 U.S.C. § 12112, and has a disparate impact on people with disabilities and women in violation of the ADA and Title VII, 42 U.S.C. § 2000e-2.[1]

---

[1] The suit also alleges violations of the Rehabilitation Act, 29 U.S.C. § 701; Section 510 of the Employee Retirement Income Security Act, or ERISA, 29 U.S.C. § 1140; and state law.

2

The plaintiff, Loretta Marshall, was originally employed by Tidelands as a registered nurse in 2008. She remained with Tidelands until 2011, when she left to work elsewhere. During this first period of employment, Marshall was not subject to the physical agility test policy for new hires, which was introduced by Tidelands only in 2010.

In 2016, Marshall again applied for a nursing position with Tidelands, this time using Tidelands' then-new online application process. That online employment application included an arbitration clause, and there is no dispute that Marshall entered into a valid arbitration agreement with Tidelands when she submitted her online application in 2016.

In 2016, the process worked as follows. As an initial online applicant, Marshall, after inputting personal information and creating a profile, was required to scroll through – and directed to read – a "PRE-EMPLOYMENT STATEMENT" that included an "Agreement to Arbitrate" governing "all claims, disputes or controversies arising out of or relating to your application for employment and application process." J.A. 49-50. At the end of the pre-employment statement was a box to be checked and the words "I ACCEPT," along with a space for an e-signature that would automatically be date- and time-stamped. Directly beneath the box was clear notice as to the implications of checking and signing: "By checking the box above next to the 'I ACCEPT' button, I am . . . agreeing to the PRE-EMPLOY[ME]NT STATEMENT which contains the Agreement to Arbitrate[.]" J.A. 52.

Again, in 2016, Marshall could not submit her application until she scrolled past the pre-employment statement and checked the "I ACCEPT" box. *See* J.A. 187. The parties agree that Marshall complied with those procedures, checking the box and signing

3

electronically, and that in so doing she entered into an arbitration agreement with Tidelands. But Marshall was not hired in 2016, because she did not pass the physical agility test.

In 2020, Marshall applied for a new position with Tidelands, again using the online application process. And it is at this point that the parties' positions diverge: Tidelands argues that Marshall again entered into a binding arbitration agreement when she submitted her 2020 online application, but Marshall insists that she did not.

As a returning user of Tidelands' online application system, Marshall faced a different process than she had in 2016. After Marshall logged into the online portal with her username and password, a current application appeared, already populated with the information from her previous 2016 application. Marshall could see and make changes to pre-populated information highlighted in yellow, and she updated certain items, such as her anticipated start date. At the top of the webpage there was a "submit" button, allowing the applicant to submit her updated application.

Only by scrolling down further would a returning applicant also see the pre-employment statement containing the proposed arbitration agreement. That statement, too, would be pre-populated with any previous acceptance of the arbitration agreement. If Marshall scrolled all the way down before clicking "Submit," in other words, she would see her 2016 arbitration agreement with the "I ACCEPT" box already checked, and her name and "4/12/2016" – the date of her previous application – already filled in next to the box. But – and in contrast to the process she underwent in 2016 – Marshall was not

4

required to scroll down through that arbitration agreement before submitting a new employment application.

Marshall submitted her application in June 2020.[2]  After a series of emails with Tidelands' human resources coordinator, Marshall scheduled a physical agility test.  She again was unable to pass the test, and consistent with its policy, Tidelands did not employ her.

**B.**

Marshall filed her putative class action lawsuit in federal district court in 2021. Tidelands promptly moved to compel arbitration under the Federal Arbitration Act ("FAA"), *see* 9 U.S.C. § 4, giving rise to the appeal now before us.

In its initial motion to compel, Tidelands did not argue that Marshall entered into an arbitration agreement in connection with her 2020 application.  Instead, it moved to compel based on the arbitration agreement signed by Marshall in 2016, when she first used Tidelands' online employment system.  According to Tidelands, that 2016 arbitration agreement governed all future employment applications, including the one submitted by Marshall in 2020.  For support, Tidelands submitted a declaration from Angela Traver, its

---

[2] Marshall does not dispute that she submitted an employment application in 2020. That matters, because it became apparent during this litigation that Tidelands' online system sometimes recorded a completed application even when a user did *not* in fact apply but instead clicked a "Save & Return" button on the website.  And Tidelands does not contend, of course, that an applicant could manifest assent to an arbitration agreement contained in an employment application by saving rather than submitting the application. But because the parties agree that Marshall indeed submitted a 2020 application, this technical glitch, while perhaps raising questions about the general reliability of Tidelands' system, does not bear on the outcome here.

Director of Employee Relations and HR Compliance, expressing her view that Marshall's 2016 application and arbitration agreement "remained active" in 2020, continuing to bind Marshall to arbitration.  J.A. 45.

The magistrate judge to whom Marshall's case was assigned disagreed.  *Marshall v. Georgetown Mem'l Hosp.*, No. 2:21-cv-02733-RMG-JDA, 2021 WL 6884559 (D.S.C. Dec. 29, 2021) (*Marshall I*).  Nothing about the 2016 arbitration agreement, the magistrate judge concluded, put Marshall on notice that it would remain in effect beyond the 2016 application cycle and cover future job applications, as well.  Instead, the language of the agreement was to the contrary, referring in the singular to "differences [that] may arise between [the parties] during *the application*," and binding the parties to arbitrate claims "arising out of or relating to *your application*."  2021 WL 6884559, at *5.[3]  Accordingly, the magistrate judge issued a report and recommendation concluding that Tidelands had not met its burden of showing the existence of an arbitration agreement related to Marshall's 2020 employment application.

Tidelands filed objections to the report and recommendation.  Importantly, it did not object to the magistrate judge's dispositive finding:  that nothing in the 2016 arbitration agreement would have informed Marshall that it governed her 2020 employment

---

[3] The relevant part of the "Agreement to Arbitrate" states as follows:  "You and Tidelands Health recognize that differences may arise between you during the application that cannot be resolved without the assistance of an outside party.  Both you and Tidelands Health agree to resolve any and all claims, disputes or controversies arising out of or relating to your application for employment and application process exclusively by arbitration to be administered by the American Arbitration Association ("AAA") pursuant to its Rules for the resolution of employment disputes."  J.A. 50.

application, as well. Instead, Tidelands advanced a new theory, supported by a new declaration from Traver. Marshall, Tidelands now asserted, entered into the relevant arbitration agreement not in 2016 but in 2020, when she again applied for employment through its online system. This was so, Tidelands argued, because "[i]n order to submit" her new application in 2020, Marshall "had to scroll past the Agreement to Arbitrate language" and "hit the 'submit' button at the bottom of the page." J.A. 135; *see also* Traver Declaration, J.A. 142 (stating a returning applicant when modifying their application "must scroll to the bottom of the page, passing through the arbitration and class waiver language[.]").

Given Tidelands' new argument and evidence, the district court referred the matter back to the magistrate judge for full briefing of issues related to the purported 2020 agreement to arbitrate. *Marshall v. Georgetown Mem'l Hosp.*, No. 2:21-2733-RMG, 2022 WL 447189 (D.S.C. Feb. 14, 2022) (*Marshall II*).

In a second report and recommendation, the magistrate judge analyzed Marshall's 2020 application process and again found that Tidelands could not establish the existence of an agreement to arbitrate. *Marshall v. Georgetown Mem'l Hosp.*, No. 2:21-cv-02733-RMG-JDA, 2022 WL 5434226 (D.S.C. July 7, 2022) (*Marshall III*). The magistrate judge began by rejecting as factually inaccurate Tidelands' latest theory, under which a returning user would be required to scroll through her prior arbitration agreement before hitting the "Submit" button at the bottom of the document. In fact, the magistrate judge explained, the screenshots attached to Traver's new declaration showed the opposite: There was a second "submit" button located at the very *top* of the document, on the initial screen

7

encountered by a returning user, which would have allowed Marshall to update her personal information and then submit her employment application without ever seeing, on screens further down, the pre-employment statement and her 2016 arbitration agreement. 2022 WL 5434226, at *3; *see* J.A. 202.

Nor, the magistrate judge concluded, was Marshall otherwise provided with reasonable notice of a 2020 arbitration agreement on offer by Tidelands.  In the internet context, the magistrate judge reasoned, a user who can conduct her business on one screen of a website is not presumed to have notice of content that would become visible only if the user took further action, like scrolling down to see additional screens.  *Id.* at *6 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016); *Specht v. Netscape Commc'ns Corp.*, 306 F.3d 17, 23 (2d Cir. 2002)).  And here, the magistrate judge concluded, there was nothing on the first screen notifying Marshall of the need to scroll down further to find a proposed arbitration agreement.  There was, to be sure, an "Arbitration Notice" at the top of the employment application, stating in all capital letters that "THIS APPLICATION AND APPLICATION PROCESS IS SUBJECT TO ARBITRATION PURSUANT TO" South Carolina law.  J.A. 157.  But that notice, the magistrate judge found, did not provide the actual terms of an arbitration agreement or direct Marshall's attention to contract terms elsewhere on the webpage.  2022 WL 5434226, at *6 n.8.

And in any event, the magistrate judge found, even if Marshall *had* scrolled to the bottom of the webpage to her 2016 arbitration agreement, she still would not have been on adequate notice of a proposed new arbitration agreement.  All Marshall would have seen

8

at the bottom of the document, the magistrate judge explained, was an "I ACCEPT" box already checked and a signature already stamped with the date of Marshall's 2016 application. Nothing on the page indicated that the terms of the 2016 agreement were on offer again, and "would be revived and converted into a new agreement to arbitrate" in 2020 if Marshall assented. *Id.* at *7. Rather than the terms of a "new agreement that could be executed," in other words, the final screen appeared to contain just "a copy of the 2016 Arbitration Agreement," already signed and date-stamped "4/12/2016." *Id.* at *7 & n.9.

A lack of reasonable notice was not the only problem with Tidelands' position, the magistrate judge went on to find. Even if Marshall had been on notice of a proposed 2020 arbitration agreement, Tidelands could not show that she manifested her assent to that agreement. *Id.* at *6. As a returning user, Marshall could apply for employment simply by modifying some personal information and then clicking a "submit" button – and the "word 'submit,'" the magistrate judge explained, "does not, in its ordinary meaning, manifest assent to an agreement or acceptance of any terms and conditions." *Id.* Nor was there any notice "adjacent to or near the 'submit' button" to fill that gap, explaining that by clicking "submit," the applicant would be agreeing to arbitrate. *Id.* (citing *Sgouros*, 817 F.3d at 1035).

In sum, the magistrate judge concluded that Tidelands could establish neither that Marshall was on reasonable notice of a proposed 2020 agreement to arbitrate nor that she manifested assent to such an agreement. Because Tidelands could not meet its burden of showing the existence of an agreement to arbitrate, the magistrate judge again recommended that its motion to compel arbitration be denied. *Id.* at *7-8.

9

Tidelands again objected, dropping what had been its primary argument before the magistrate judge – that a returning job applicant would be required to scroll through a prior arbitration agreement before applying – but disputing other parts of the report and recommendation. The district court agreed with the magistrate judge, summarizing and endorsing her reasoning and denying Tidelands' motion to compel arbitration. *Marshall v. Georgetown Mem'l Hosp.*, No. 2:21-2733-RMG, 2022 WL 4078024 (D.S.C. Sept. 6, 2022) (*Marshall IV*).

Tidelands timely appealed. We have jurisdiction to consider that appeal under the FAA. *See* 9 U.S.C. § 16; *Chorley Enterprises, Inc. v. Dickey's Barbecue Restaurants, Inc.*, 807 F.3d 553, 561 (4th Cir. 2015).

## II.

The district court "in effect granted summary judgment" to Marshall, finding that the undisputed evidence shows, "as a matter of law, [that] the parties did not form an agreement." *Rowland v. Sandy Morris Fin. & Estate Planning Servs., LLC*, 993 F.3d 253, 258 (4th Cir. 2021). We review that decision de novo. *Id.* at 257.

The dispositive question on appeal is whether Tidelands can show that Marshall entered into an agreement to arbitrate when she submitted her online application for employment in 2020.[4]

---

[4] Marshall argues both that she did not agree to arbitrate in 2020 and, in the alternative, that her claims regarding Tidelands' physical agility test fall outside the scope of the purported arbitration agreement on which Tidelands relies. *See Am. Gen. Life &*
(Continued)

10

As the district court emphasized, Tidelands "bears the burden of establishing the existence of a binding contract to arbitrate." *Minnieland Priv. Day Sch., Inc. v. Applied Underwriters Captive Risk Assurance Co., Inc.*, 867 F.3d 449, 456 (4th Cir. 2017); *see Marshall IV*, 2022 WL 4078024, at *2; *Marshall III,* 2022 WL 5434226, at *4. To the extent Tidelands suggests that it can rely on the "liberal federal policy favoring arbitration agreements," *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983), to assist in meeting this burden, it is mistaken. Arbitration is "strictly a matter of consent," *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019) (internal quotation marks omitted), and unless Tidelands can show that there "already exists an enforceable arbitration agreement between the parties," there is no presumption in favor of arbitration to be applied. *Raymond James Fin. Servs., Inc., v. Cary*, 709 F.3d 382, 385-86 (4th Cir. 2013); *see Marshall III,* 2022 WL 5434226, at *3 n.4 ("Although courts have recognized a presumption in favor of arbitration . . . that presumption does not apply to disputes concerning whether an agreement to arbitrate has been entered between the parties.").

"Whether an agreement to arbitrate was formed is . . . a question of ordinary state contract law principles." *Rowland*, 993 F.3d at 258. The parties here agree that South Carolina contract law governs, and they also agree – at least in broad brush-strokes – as to what it requires: Under South Carolina law, Tidelands must show (1) that Marshall had reasonable notice of an offer to enter into an arbitration agreement, and (2) that Marshall

---

*Accident Ins. Co. v. Wood*, 429 F.3d 83, 87 (4th Cir. 2005) (listing elements movant must establish in support of motion to compel arbitration). Like the district court, we agree with Marshall's first point and therefore do not address the second.

11

manifested her assent to that agreement. *See Lampo v. Amedisys Holding, LLC*, 877 S.E.2d 486, 489-90 (S.C. Ct. App. 2022), *cert. granted*, No. 2022-001362 (S.C. Feb. 7, 2024); *Edens v. Laurel Hill, Inc.*, 247 S.E.2d 434, 436 (S.C. 1978).[5]  The district court held that Tidelands could make neither of these showings, and for the reasons explained below, we agree.

## A.

We begin with the question of reasonable notice.  The parties agree that when Marshall entered the Tidelands' online portal in 2020 as a returning user, the "Agreement to Arbitrate" she signed in 2016 became available to her – not on the screen initially visible, but at the bottom of the document, to which she could have scrolled.  According to Tidelands, that was enough to put Marshall on notice that it was offering her an arbitration agreement in 2020:  "It was all there in the application she was revising.  It was all in one document."  Br. of Appellant at 14.  Like the district court, we disagree.

---

[5] The parties disagree on one issue related to notice, with Marshall contending that only actual notice will do and Tidelands arguing that constructive or inquiry notice is sufficient.  We need not bear down here on the distinction between actual and constructive notice under South Carolina law, which has at times generated confusion in the South Carolina courts themselves.  *See Strothers v. Lexington Cnty. Recreation Comm'n*, 504 S.E.2d 117, 122 & n.6 (S.C. 1998) (addressing confusion in appellate courts).  Instead, we can decide this case in Marshall's favor even if we assume, *arguendo*, that the less demanding constructive notice standard applies.  We do note, however, that the authority on which Marshall relies for her actual notice argument addresses only the notice required when an employer attempts to modify an employment agreement unilaterally through edits to an employee handbook.  *See Fleming v. Borden, Inc.*, 450 S.E.2d 589, 595-96 (S.C. 1994).  South Carolina courts have yet to extend the actual notice rule beyond that context. *See Lampo*, 877 S.E.2d at 490; *see also Hughes v. Charter Commc'ns, Inc.*, No. 3:19-CV-01703-SAL, 2020 WL 1025687, at *9 (D.S.C. Mar. 2, 2020).

As our court has observed, "[t]here is no question that the digital age has changed the nature of contract formation." *Rowland*, 993 F.3d at 260. The fundamental principles of contract law continue to apply, *id.*; the "trick" is that now they must be applied to a new form of contracting, *Sgouros*, 817 F.3d at 1034; *Lampo*, 877 S.E.2d at 490-91 (explaining that South Carolina courts "judge online transactions by the same law that has long governed contracts"). In the internet context, the traditional notice inquiry focuses on "the design and content of the relevant interface," *see Starke v. SquareTrade, Inc.*, 913 F.3d 279, 289 (2d Cir. 2019), and asks whether it would put a "reasonably prudent user" on notice of a contract on offer and its terms, *Foster v. Walmart, Inc.*, 15 F.4th 860, 864 (8th Cir. 2021); *see also*, *e.g.*, *Starke*, 913 F.3d at 289; *Sgouros*, 817 F.3d at 1034-35; *Sarchi v. Uber Techs., Inc.*, 268 A.3d 258, 268-69 (Me. 2022). Offers and terms that are made "reasonably conspicuous" generally will satisfy this standard. *See Foster*, 15 F.4th at 864 (internal quotation marks omitted); *Soliman v. Subway Franchisee Advert. Fund Tr., Ltd.*, 999 F.3d 828, 835 (2nd Cir. 2021). [6] But Tidelands' online application system, as experienced by Marshall as a returning user in 2020, falls short.

---

[6] As noted above, South Carolina law governs this dispute. But the law on internet contracts is not yet well-developed in South Carolina, and like our sister courts, we find it helpful to look for guidance to cases applying similar state contract-law principles in the internet context. *See*, *e.g.*, *Sgouros*, 817 F.3d at 1035-36; *Soliman*, 999 F.3d at 834 n.4; *Sarchi*, 268 A.3d at 265. We note that neither party has identified any feature of South Carolina contract law that might distinguish it from the state law at issue in these other cases.

Some courts applying traditional state contract principles have found it helpful to sort internet contracts into certain categories corresponding roughly to the means by which a website invites assent. *See*, *e.g.*, *Foster*, 15 F.4th at 863 (describing "clickwrap" and (Continued)

1.

Tidelands' earlier position, recall, was that Marshall necessarily was on notice of an offer to renew her 2016 arbitration agreement when she returned to its online system in 2020, because she was *required* to scroll through that 2016 agreement to reach a "submit" button at the bottom of the webpage. It is true that when an internet user is required to "interact" with contract terms, "such as by having to scroll through them," she is generally treated as having actual notice of those terms. *Sarchi*, 268 A.3d at 269; *see Foster*, 15 F.4th at 863. But Tidelands has since dropped this argument, because it turns out that the factual premise is incorrect: Thanks to a second "Submit" button at the top of the webpage, Marshall could enter all necessary updates and submit her application without ever scrolling down to the 2016 arbitration agreement. *Marshall IV*, 2022 WL 4078024, at *2.

Instead, Tidelands relies now on the fact that Marshall *could* have scrolled down to find the 2016 arbitration agreement near the end of its webpage. But in the internet context, courts have rejected constructive notice claims based on information that "would have become visible to [users] only if they had scrolled to the next screen." *See Starke*, 913 F.3d at 289 (quoting *Specht*, 306 F.3d at 23). Where a user can complete her business on one screen, "there is no reason to assume that [she] will scroll down to subsequent screens

---

"browsewrap" arrangements); *Sarchi*, 268 A.3d at 267 (adding categories of "sign-in wrap" agreements, "a hybrid of clickwrap and browser wrap agreements" and "scrollwrap" agreements, which "require[] a user actually to view . . . the terms"). But how a web-based agreement is classified does not resolve the validity of a putative contract, which remains a "fact-intensive inquiry." *Soliman*, 999 F.3d at 825 (internal quotation marks omitted). Because the parties and the district court have analyzed Tidelands' webpage without using this terminology, we likewise do not apply it here.

simply because screens are there." *Specht*, 306 F.3d at 32; *see Sgouros*, 817 F.3d at 1035 ("[W]e cannot presume that a person who clicks on a box that appears on a computer screen has notice of all contents not only of that page but of other content that requires further action (scrolling, following a link, etc.)"). Marshall may well have known that there was "unexplored" territory below the screens on which she was operating. *Specht*, 306 F.3d at 32. But without more, she was not on inquiry notice that this territory included a contract offer and she was not obliged to go exploring for one. *Id.*

For Tidelands, this is all just a new twist on the old "I didn't read the contract" excuse, and Tidelands reminds us that failure to read a contract is not a defense to enforceability. Multiple courts have rejected similar arguments, however, explaining that the duty-to-read principle must take account of the realities of the digital realm. While a person signing a physical contract "will rarely be unaware of that fact," a person using the internet "may not realize that she is agreeing to a contract at all," or that contract terms appear on submerged screens or through hyperlinks. *Sgouros*, 817 F.3d at 1034-35. And the duty-to-read rule has always excepted cases in which "the writing does not appear to be a contract and the terms are not called to the attention of the recipient." *Specht*, 306 F.3d at 30; *Starke*, 913 F.3d at 295. Transposed to the internet context, "the duty to read does not morph into a duty to ferret out contract provisions when they are contained in inconspicuous hyperlinks," *Starke*, 913 F.3d at 295, or can be found only by scrolling down through additional screens, *Specht*, 306 F.3d at 30-32.

2.

15

Tidelands has a fallback argument, as well. Even if internet users are not generally bound to go searching around for contract terms, Tidelands says, Marshall was put on notice of the need to scroll down by the arbitration statement at the top of its webpage: "ARBITRATION NOTICE:  THIS APPLICATION AND APPLICATION PROCESS IS SUBJECT TO ARBITRATION PURSUANT TO THE SOUTH CAROLINA UNIFORM ARBITRATION ACT, S.C. CODE ANN. § 15-48-10, ET SEQ." J.A. 157. Once Marshall saw *that* notice, Tidelands argues, she would have known that an arbitration agreement was on offer somewhere on its webpage and that it was up to her to find the terms.

Marshall does not dispute that a conspicuous alert on the screen before her, drawing her attention to the existence of contract terms elsewhere in the document, would have been enough to put her on inquiry notice of those terms. That is a wise concession. Courts – including in South Carolina – generally find that when a website provides clear and reasonably conspicuous notice that there are contract terms available by scrolling down or clicking a hyperlink, the user is on reasonable notice of those terms even if she never reads them. *See Lampo*, 877 S.E.2d at 488, 490 (finding employee on notice of arbitration agreement accessible by hyperlink where link is accompanied by notice that it contains important materials affecting legal rights that employees are required to read, and employee clicks button to "acknowledge" receipt); *see also, e.g.*, *Sgouros*, 817 F.3d at 1035 (noting importance of using conspicuous hyperlinks to ensure purchasers are on notice of terms); *Specht*, 306 F.3d at 31 (declining to enforce contract terms available only by scrolling down in absence of "immediately visible notice of the existence of [contract] terms"); *Sarchi*,

16

268 A.3d at 270-71 & n.11 (canvassing authority on whether interface gives reasonable notice of contract terms available by hyperlink).

The question, then, is whether the arbitration statement at the top of Tidelands' webpage was enough to put Marshall on reasonable notice that there was an agreement on offer, and that she should scroll down to find it. The district court thought not. The court did not express any doubt as to the "conspicuousness" of Tidelands' all-caps arbitration notice. The problem, as the district court saw it, was with the content: The arbitration statement neither provided nor referred to the actual terms of a proposed agreement. *See Marshall IV*, 2022 WL 4078024, at \*2. There was nothing, that is, to call Marshall's attention to contract terms further down the webpage, or even to notify her of the existence of such terms. Instead, as Marshall argues, an unequivocal statement that her application *already* was subject to arbitration by operation of South Carolina law might give the opposite impression, conveying not that she was being asked to agree to arbitrate but instead that the matter was out of her hands and already resolved.

We are inclined to agree with the district court. To put a user on reasonable notice of the need to search for contract terms, there must be some "clear and conspicuous" statement. *See Soliman*, 999 F.3d at 834; *Sgouros*, 817 F.3d at 1035 (refusing to enforce arbitration agreement accessible by hyperlink where "the web pages on which [the user] completed his purchase contained no clear statement" of "*any* terms and conditions of sale"). And what Tidelands' top-of-the-page statement most clearly tells a user is that her application is subject to South Carolina arbitration law – not that it is subject to contract

17

"terms and conditions" that can be reviewed and agreed to by scrolling down or clicking a hyperlink. *Cf. Sgouros*, 817 F.3d at 1035.

3.

But even if Tidelands were right – even if Marshall were obliged to scroll down – it would not change the outcome here, because we also agree with the district court that scrolling down *still* would not have provided Marshall with reasonable notice. As the court explained, the only thing Marshall would have found had she scrolled to the bottom of the Tidelands' webpage was her 2016 arbitration agreement, date-stamped April 12, 2016, its "I ACCEPT" box already checked, and her electronic signature already appended. *Marshall III*, 2022 WL 5434226, at *7. Nothing about that set-up would have indicated, clearly and conspicuously, that Marshall was not reviewing an old agreement but instead being asked to form a new one. *Id.*

Tidelands' position is that the language of the 2016 arbitration agreement itself does that work, clearly outlining the terms of an agreement on offer just as it did in 2016. But in 2016, of course, the context around that language was different. As a first-time user, Marshall was required not only to scroll down through the lengthy arbitration agreement but also to check a then-open "I ACCEPT" box at the end – a clear enough indication that she was being offered, and accepting, an agreement to arbitrate. In 2020, by contrast, Marshall would have encountered only the text of her 2016 arbitration agreement, clearly labeled as such. And that text alone cannot be enough to give notice of an offer to arbitrate in 2020. We know that because the magistrate judge, in her first report and recommendation, rejected almost precisely the same contention, finding that the terms of

18

the 2016 agreement would *not* put a user on notice that the agreement could apply as well to future job applications. *See Marshall I,* 2021 WL 6884559, at \*5 (emphasizing singular nature of arbitration agreement's references to "the application" and "your application"). And Tidelands, critically, never objected to that ruling, pivoting instead to a new argument, which means we cannot revisit the issue here. *See Martin v. Duffy*, 858 F.3d 239, 245 (4th Cir. 2017) (explaining that failure to object forfeits issue on appeal).

At bottom, all of Tidelands' notice arguments reduce to this: Marshall should have known she needed to scroll down to the 2016 arbitration agreement at the end of its webpage, and if she had, she would have known that the same terms were on offer again. The district court rejected both prongs of that analysis, and for the reasons given above, we agree.

**B.**

We also agree with the district court that Tidelands cannot show the second requirement for contract formation under South Carolina law: that Marshall manifested her assent to its arbitration agreement in 2020. To apply for a job online in 2020, Marshall was not required to scroll through Tidelands' pre-employment statement and agreement to arbitrate, or to click the "I ACCEPT" button. Instead, she needed only to update pre-populated personal information as needed (for instance, by entering a new proposed start date) and click a "Submit" button at the top of the webpage. As the district court held, that is not enough to manifest assent to an arbitration agreement.

Here again, we apply old contract principles to a new online context. So it remains the case, as Tidelands argues, that assent to a contract may be manifested by conduct. *See*

19

*Lampo*, 877 S.E.2d at 490; *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 74 (2d Cir. 2017) (recognizing that online assent may come in form of word or conduct). But that does not mean that every use of a website – every purchase, download, application, or the like – can reasonably be understood as consent to contractual terms.

Instead, courts "have emphasized the importance of clearly signaling to the [user] in some fashion that, by continuing with the transaction or by using a website, she will be agreeing to the terms contained" in an accompanying contract. *Soliman*, 999 F.3d at 837. It is not enough that a user has clicked a button: "[C]licking on a button on a webpage, viewed in the abstract, does not signify a user's agreement to anything." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 857 (9th Cir. 2022). Only "if the user is explicitly advised that the act of clicking will constitute assent" to an agreement will it have that effect. *Id.*; *see also*, *e.g.*, *Specht*, 306 F.3d at 29-30 (holding that "clicking on a download button does not communicate assent to contractual terms if the offer did not make clear to the consumer that" it "would signify assent").

The formation of Marshall's 2016 arbitration agreement provides a useful point of comparison. In 2016, after scrolling through the agreement to arbitrate that was part of Tidelands' pre-employment statement, Marshall was required to click a button labeled "I ACCEPT." J.A. 52. When website buttons have labels denoting assent, like "I accept" or "I agree," a user's click "can suffice to signify the acceptance of a contract." *Sgouros*, 817 F.3d at 1033-34; *see Sarchi*, 268 A.3d at 268 ("[A]n agreement is more likely to be enforceable if the button to be clicked clearly signals assent, such as 'I agree,' rather than . . . 'continue' or 'register.'"). And even if a button is not so labeled, a clear and

20

conspicuous notice that a click nevertheless will be taken as assent can do the trick. *See Berman*, 30 F.4th at 857-58; *Soliman*, 999 F.3d at 837-38. In 2016, Tidelands took that extra measure, as well, specifying immediately under its "I ACCEPT" box that "[b]y checking the box above next to the 'I ACCEPT' button" the user is "agreeing to the PRE-EMPLOY[ME]NT STATEMENT which contains the Agreement to Arbitrate[.]" J.A. 52.

But Tidelands took neither of those precautions in 2020 with respect to now-returning user Marshall. In 2020, as the district court observed, the only button Marshall was required to click said "submit," and unlike "accept" or "agree," "the word 'submit' does not, in its ordinary meaning, manifest assent to an agreement or acceptance" of contract terms. *Marshall III,* 2022 WL 5434226, at *6; *see also Sarchi*, 268 A.3d at 272 (holding that clicking "DONE" button on Uber website does not manifest assent because "to a reasonably prudent user, clicking 'DONE' would not indicate assent to a contract"). Nor, this time, was there any notice near the relevant button to explain that "by clicking 'submit,' the applicant is agreeing to any terms and conditions or that she would be bound to an arbitration agreement." *Marshall III,* 2022 WL 5434226, at *6. And contrary to Tidelands' suggestion, there also was nothing to indicate that Marshall could *uncheck* the "I ACCEPT" box in her 2016 arbitration agreement if she wished to decline the same offer in 2020. In contrast to the belt-and-suspenders approach it took in 2016, in other words, Tidelands in 2020 did nothing to inform Marshall that her conduct – clicking a "submit" button to enter a job application through its online system – would constitute assent to an arbitration agreement. *See Sarchi*, 268 A.3d at 269 ("In the context of online contracts, the question of assent often comes down to whether the website adequately informs the user

21

that conduct such as clicking on a button constitutes assent to contract terms so as to justify an inference that the user intends to be bound.")

## III.

Internet contracts have routinely been upheld by courts, including in South Carolina, *see Lampo*, 877 S.E.2d at 490-92, and nothing in this opinion should be understood to suggest any skepticism of such contracts. Indeed, the parties agree that Marshall entered into a valid web-based arbitration agreement once before: In 2016, Marshall was put on reasonable notice of the arbitration agreement on offer when she was required to scroll through it and then check a box indicating acceptance; and she manifested her assent when she checked an "I ACCEPT" box immediately adjacent to notice that checking it would constitute agreement to arbitrate. But for whatever reason – perhaps no more than oversight – Tidelands did not adhere to the same standards in 2020,[7] and we must agree with the district court that no arbitration agreement was formed when Marshall submitted her 2020 application.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*

---

[7] Counsel for Tidelands indicated at oral argument that the company has since revised its online application system for returning users, addressing the issues identified by the district court and discussed in this opinion.